UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MILLEDGE, LORENZO
     Plaintiff

v.

SIMSBURY PUBLIC SCHOOLS
     Defendant

## **AMENDED COMPLAINT**

## I. PRELIMINARY STATEMENT

1.     This is an action for compensatory, declaratory, and injunctive relief to redress the deprivation by the Defendant of rights secured to the Plaintiff by Title VII of the Civil Rights of 1964, as amended, Connecticut General Statutes §46a-60, and Connecticut General Statutes § 31-51q.

## II. JURISDICTION

2.     Jurisdiction of this Court is invoked pursuant to the Provisions of Sections 1331, 1332, 1343 (3) and 1367 (a) of Title 28, and 1988 of Title 42 of the United States Code.

## III. VENUE

3.     Venue is proper in this Court because the acts alleged herein occurred within the State of Connecticut.

## IV. STATEMENT OF FACTS

4.     Plaintiff, Lorenzo Milledge, is Black, African American, who resides at 8 Concorde Way, Unit B-l in Windsor Locks, CT 06096.

5.     Defendant is Simsbury Public Schools, located at 933 Hopmeadow Street; Simsbury, CT 06070-1897.

6.      During all material times Plaintiff worked as a Head Coach and Security Guard at Simsbury High School, located at 34 Farms Village Road, Simsbury, Connecticut.

7.      The Principal of Simsbury High School is Steve Patrina (Caucasian); the Athletic Director of Simsbury High School is Jeff Pinney (Caucasian) and the Director of Human Resources and former High School Principal of Simsbury High School is Neil Sullivan (Caucasian).

8.      The comparators in Plaintiff's complaint include Head Coaches in the Simsbury Public School system that were not terminated, suspended or placed on probation for interacting with predominantly Caucasian students.

9.      The names of each of these Head Coaches and the race of each of them are as follows: a. Boys Basketball Head Coach-Greg Stillman (Caucasian male); b. Girls Basketball Head Coach-Sam Zullu (Caucasian male); c. Girls Softball Coach-Jed Flaherty(Caucasian male); d. Boys Baseball Head Coach-Niko Zimmitty (Caucasian male); e. Boys Tennis Head Coach-Mike McCain (Caucasian male); f. Girls Tennis Head Coach-Liz Keppel (Caucasian female); g. Boys and Girls Cross Country Ski Head Coach-John Mudano (Caucasian male); h. Cheerleader Coach-Stacy Roos (Caucasian female); i. Boys Hockey Head Coach-Christopher Day (Caucasian male); j. Girls Hockey Head Coach-Paul Melanson (Caucasian male); k. Boys Crew Head Coach-Adam Askham (Caucasian male); l. Girls Crew Head Coach-Ann Carabillo (Caucasian female); m. Boys Soccer Head Coach-Kevin McKenna (Caucasian male); n. Girls Soccer Head Coach-Steve Jarvis (Caucasian male); o. Boys and Girls Volleyball Head Coach-Brian Leblanc (Caucasian male); p. Boys Wrestling Head Coach-T.J. Silva (Caucasian male); q. Boys Football Head Coach-David Masters (Caucasian male); r.

Boys Cross Country Head Coach-Erik Petersen (Caucasian male); s. Girls Cross Country Head Coach-Megan Shumway (Caucasian female); t. Boys Rugby Head Coach-Ed Matteo (Caucasian male)

10.    On or around the beginning of February 2020, a student not of Plaintiff's class basis spit on him at a sporting event and poured water on him after spitting in it. This act was recorded on a camera operating in the gym.

11.    Plaintiff was told by Athletic Director Pinney and Principal Patrina, that the school would handle this matter.

12.    Plaintiff, who was stressed, humiliated and embarrassed over this public event, was then faced with a potential health risk from a student who believed that he could spit on a Black man, and an authority figure, with impunity.

13.    Upon information and belief, no Caucasian Coach in the Simsbury Public School system was ever spit on or assaulted by a student.

14.    It was Plaintiff's belief that school administration did not take more severe disciplinary steps against the student in this matter because the Plaintiff is a Black male.

15.    When Plaintiff found out that the only discipline that the student received was detention, he filed a complaint against this student with the Simsbury Police Department. During this complaint to the police, Plaintiff he brought up the fact that the student in question was permitted to spit on him, a Black male, with no real consequence and that it appeared racially discriminatory by SimsburyPublic Schools. After Plaintiff filed this external complaint, the student was given in-school suspension.

16.    When Plaintiff filed the police complaint against the student who spit on him, Mr.

Sullivan was angry with Plaintiff for contacting the Simsbury Police to report this student's actions, and he voiced these feelings to Plaintiff.

17.     Plaintiff believes that Mr. Sullivan retaliated against him for calling the police on the student who engaged in a dangerous, discriminatory, offensive, health threatening assault, against Plaintiff, who happened to be the only Black Head coach of both Boys and Girls indoor and outdoor track, in the Simsbury School system. Had the situation been reversed, Complainant would certainly have been terminated for his actions, and criminally charged.

18.     On or around February 2020, the father of one of the female runners on Plaintiff's relay team was upset with him, because Plaintiff would not allow his daughter to run three back-to-back relays at a State Open Championship.

19.     The father came to the school, complained about Plaintiff, and wrote a two-page letter, falsely claiming that Plaintiff had touched his daughter inappropriately, and that he was pulling children out of the relay (including his daughter).

20.     The father was disgruntled because his daughter was pulled out of the relay.  An investigation ensued following the parent's complaint, and the Athletic Director Jeff Pinney (Caucasian male) conducted the investigation into the matter.

21.     Plaintiff was confronted in the hallway by Athletic Director Pinney in front of students and told that there was a complaint about him touching students.

22.     A call was then made on the walkie talkie stating that Plaintiff was not to come to Pinney's office. Security guards, custodians, teachers, students and other staff members heard Pinney's damaging and defaming allegations against Plaintiff over the airways by way of the walkie talkie.

23.    Plaintiff was immediately pulled out of coaching and placed on paid administrative leave.

24.    Plaintiff was told not to go to the track meet, and he was further instructed not to contact any of the students.

25.    Plaintiff missed the track meet in question and the Athletic Director, upon information and belief, told the Assistant Coach who was now coaching in Plaintiff's absence, not to change the relay and not to remove the student from the relay, whose father filed the false claim against Plaintiff when he did not put his daughter into the relays. This meant that the student whose father complained about being removed from the relay was now back in the relay, and the Plaintiff was out on Administrative Leave. The relay team and the student in question did not even score in the State Open Championship.

26.    At the time Plaintiff was placed on administrative leave, Patrina was promoted from the position of Acting Principal to the position of Principal of Simsbury High School.

27.    Even though Patrina had formerly held Plaintiff in high regard, and protected him from many unjust acts of the administration, after he was appointed to the position of Principal he withdrew his support from the Plaintiff, and sided with the administration in attempting to have Plaintiff removed from his Head Coaching position.

28.    Patrina stated that he had no problem with Plaintiff remaining as a security guard, however.

29.    Even Sullivan stated that "Lorenzo knows the boundaries as a security guard in dealing with the students," and he would not have a problem with Plaintiff continuing in his job as security guard. It became apparent that Simsbury High School, (even though

they obtained statewide and national notoriety as a direct result of Plaintiff's hard work, skills and competency as a Head Coach, Simsbury High) was "not ready" for a Black Head Coach.

30.    Upon information and belief for the first time in the history of the school, one Head Coach was required to serve as both Head Indoor Track Coach for Boys and Girls, and Head Outdoor Track Coach for Boys and Girls (a Head Coach for girls and a Head Coach for boys).

31.    Plaintiff had been paid for one Head Coach position, but required to do the work of two Head Coaches. Even with this tremendous work load, the Plaintiff took Simsbury High School to heights that they had never reached before for indoor boys and girls track.

32.    Defendant replaced Plaintiff with two people; he did the work of two Head Coaches, while the Simsbury Public Schools was unjustly enriched by Plaintiff doing the job of two Head Coaches but being paid for one.

33.    When the Plaintiff realized that his Head Coach Position was being threatened, he retained Attorney Cynthia Jennings (Black female) to attend and represent him at a meeting held on March 4, 2020, between Human Resources Director of Simsbury Public Schools, Neil Sullivan; Simsbury Athletic Director Jeff Pinney; School Principal Steve Patrina; Lorenzo Milledge; and Vickie Brooks, (Plaintiff's sister).

34.    At a March 9, 2020, meeting, Mr. Sullivan asked Plaintiff to resign from the position of Head Coach or be fired. Sullivan stated that if Plaintiff did not resign, that he stood to have his reputation destroyed when other schools contacted him for a

reference, and Sullivan stated that he would share damaging information about Plaintiff with schools contacting him for coaching references.

35.     In this March 9, 2020 meeting, Plaintiff was given a typed letter of resignation by Human Resources Director, Neil Sullivan, dated March 9, 2020 to sign. Attorney Jennings, who was representing the Complainant, stated that she thought that the purpose of the March 4, 2020 meeting was to go over the DCF investigation and their findings regarding allegations made against Plaintiff.

36.     Sullivan stated that he had not yet received the letter outlining the findings of DCF from their investigation, although he believed that based on telephone conversations with DCF, that the charges against Plaintiff may be found to be not substantiated.

37.     Attorney Jennings asked Sullivan, if DCF reported that the charges brought forth against Plaintiff, were not substantiated, would he be reinstated into his coaching position.  Plaintiff was still out on paid administrative leave pending the outcome of the investigation. Sullivan stated that "if the charges came back from DCF, and they were not substantiated, Plaintiff would be returned to his coaching position. "

38.     Attorney Jennings stated that in that case they would wait for the final DCF determination, and that Plaintiff would not be signing anything that day. Attorney Jennings asked for a copy of the letter of resignation, given to Plaintiff by Neil Sullivan, HR Director on March 9, 2020. Attorney Jennings at that point, stated that Plaintiff would not be signing anything that day. The meeting was then terminated to wait for the completion of the DCF Investigative Decision.

39.    On March 9, 2020, at the second meeting called by Sullivan, Plaintiff was humiliated by Sullivan, and falsely accused of inappropriately touching a student. Sullivan told Plaintiff that he would destroy his career, and Sullivan presented a video at the meeting, that had not been seen before. When Sullivan was asked if that information could be submitted to DCF to include as part of their investigation, Sullivan refused to do so.

40.    Sullivan provided anecdotal information from unknown students; threatened Plaintiff with going public with this information, threatened his future employment opportunities, even though he was the highest performing Indoor Head Coach in the history of Simsbury High School, with tremendous support from parents, students and members of the Simsbury community.

41.    In the March 9, 2020 meeting, Sullivan repeatedly humiliated the Plaintiff in this termination process, treating him as if he were a sex offender; and a danger to students at Simsbury High. He charged Plaintiff with inappropriately touching students, making students feel uncomfortable, and intentionally attempted to humiliate Plaintiff, disparage him, and defame his character. Sullivan did all this to attempt to force Plaintiff to resign from his Head Coach position. No other Caucasian Head Coach was humiliated in this manner and had their character assassinated in an effort to force them to resign from their positions in the face of false, discriminatory, and disingenuous charges.

42.    Mr. Patrina had formerly been a strong supporter of Coach Milledge when he was Assistant Principal of Simsbury High School. It now became apparent that Patrina used Plaintiff's multiple successes to put Simsbury High School on the State and National map.

43.     Plaintiff made it possible, through his coaching skills, for multiple students of all races and cultures, to obtain athletic scholarships because of his winning record. Ironically, Patrina, having now been promoted to the Principal of Simsbury High School, suggested to Plaintiff in the March 4 meeting, that maybe he should go back to Hartford High, a predominantly Black and Latino High School. This was the equivalent of telling someone Black to go back to Africa.

44.     The humiliation of the Plaintiff in the March 4, 2020 meeting, included Mr. Pinney, the Athletic Coach, jumping into the conversation between Attorney Jennings and Sullivan, where she asked Sullivan if he was going to continue humiliating Plaintiff, and whether or not he had anything else that he had to discuss with Plaintiff, other than to continue his ongoing character assassination of the Plaintiff in this meeting.

45. I   t was clear that the plan was to have Plaintiff resign on his own, and to sign a pre-typed resignation letter given to him by Sullivan. This forced resignation, couched in bullying tactics and disparaging, false statements, was in fact, set up to terminate Plaintiff before the DCF letter arrived, possibly not substantiating false charges made against him by a disgruntled parent, and disgruntled students, and finally absolving Plaintiff of any charges.

46.     In the March 9, 2020 meeting, Pinney even accused Attorney Jennings (Black Female) of attempting to "bait" Sullivan when she asked Sullivan, why the administration believed that the Plaintiff was a danger to students as a Head Coach, and not a danger to these same students when he worked as a security guard in the same school, with the same students.

47.     Sullivan terminated Plaintiff following the March 9, 2020 meeting, based on his own flawed investigation, where he interviewed students who were disgruntled, but failed to interview any students who were in support of Coach Milledge. Sullivan decided to terminate Plaintiff based on his alleged "inappropriate" behavior of touching students and allegedly making them feel uncomfortable.

48.     Plaintiff reminded Sullivan that his wife would hug him when she came to the school, and reminded Mr. Pinney that his own child loved him, and would come to the school and run up to him and hug him as well. Plaintiff questioned why this was never brought up as an issue when it was their family members.

49.     Plaintiff was terminated because Sullivan believed that as a Black man, he should not touch Caucasian children, although most of them loved Plaintiff dearly, and performed well because of the relationship that Coach had established with them as a "father figure"

50.     After charging that Plaintiff engaged in multiple baseless charges of "inappropriate" contact with students, which DCF has not substantiated, and following the request by Vickie Brooks and Attorney Jennings, that he present the videotape that he presented in the March 9, 2020 meeting to DCF, Sullivan refused to present this information to DCF to include in their investigation.

51.     Plaintiff was terminated from his Coaching position with Simsbury Public Schools on or about April 7, 2020.

52.     Plaintiff was allowed to continue working in his position as security guard at Simsbury High School, where he was working with the very same students that he interacted with when he was Head Coach.

53.   In the March 9 meeting, when questioned about why he allowed Plaintiff to remain in his security job at the High School, Sullivan stated that Plaintiff knew the boundaries relative to student contact, and that he did not violate these boundaries with the students in his security job position.

54.   Attorney Jennings questioned Sullivan about his rationale for removal of Plaintiff from his Head Coach position at the high school for alleged "inappropriate" touching, and his "ability to draw the line" relative to alleged "inappropriate" student contact in his role as a security guard. Clearly, the administration, including Sullivan, did not perceive Plaintiff to be a danger to children at Simsbury High School.

55.   Mr. Pinney, the Athletic Director, became confrontational with Attorney Jennings, and accused her of attempting to "bait" Mr. Sullivan, the Human Resources Director when she questioned his rationale for firing Plaintiff from the position of Head Coach, and keeping him in the position of security guard.

56.   The question also come up as to how Sullivan in his personal investigation, managed to select almost every student that had not been given the assignment that they wanted in the track and field events, and how he managed not to interview any students who were supportive of Plaintiff regarding his character and conduct. This question as to how Sullivan selected the students who testified against Plaintiff came up because it was apparent that Sullivan was interviewing disgruntled students who were not selected to serve as starters on Plaintiff's teams.

57.   Plaintiff's coaching and leadership style was questioned by Sullivan, even though Plaintiff had brought a great deal of money and notoriety to Simsbury High School. Pinney, the Athletic Director, who the Plaintiff worked under, was the obvious,

continuous and ongoing recipient of Plaintiff's excellent coaching record and hard work with students, many of whom became athletic stars under his leadership, training, guidance and direction.

58.    Pinney, never spoke one word in support of Plaintiff in either of these two meetings (March 4 2020 and March 9, 2020). It was apparent that there was a plan between the three administrators—Pinney, Patrina and Sullivan, to remove the Plaintiff from the Head Coaching position, and maintain him in his security guard position, where the administration felt more comfortable with him.

59.    Simsbury High School had never had a Black Head Coach, and when they did hire one, they decided that they would rather destroy the school record and economic opportunities for students of all races and cultures, than to see a Black man gaining fame and notoriety as a Head Coach in Simsbury, a White, upper class town.

60.    Defendant administration was more comfortable moving Plaintiff out of the Head Coach position, and back into working as a security guard. Defendant clearly believed that the Plaintiff, did not "know his place," as a Black man, and they wanted him to serve as a constant reminder to students, staff and administration, that the highest level a Black man should or could aspire to reach in the Simsbury Public Schools, was that of a security guard.

61.    The humiliation, overt discrimination, and disparate treatment was done to a man who created a multi-cultural athletic leadership team among his assistant coaches and provided hundreds of thousands of dollars to all students within Simsbury High School. This overt humiliation and attempt to stereotype Plaintiff, started because he would not allow a student to spit on him, and disrespect him in front of hundreds of other students.

62.     As a result, Sullivan decided to personally remove Plaintiff from his Head Coach position and allowed to continue to work as a security guard, in a stereotypical position where the school administration believed to be "his place." This humiliation was intentional, and done during the termination process, to make a point as to who was in control, and what they would do to his next job, as a minimum wage security guard, if he did not "learn his place. "

63.     After the humiliation that Plaintiff was faced with in the March 9, 2020 termination meeting he left the meeting where he had been bullied and humiliated, went home, became ill, and was rushed to the hospital with a heart attack. He spent several days in the hospital following this heart attack.

64.     The stress Plaintiff experienced in the March 9, 2020 meeting where he was bullied, humiliated, discriminated against, and treated like a pedophile, by the Defendant's agents, Sullivan, Pinney and Patrina, resulted in the sudden onset of a heart attack immediately following the March 9, 2020 meeting.

65.     Plaintiff's life threatening heart attack following the March 9, 2020 meeting, did not stop Defendant's Human Resources Director Sullivan, from continuing to attempt to call and text him, continuing to hound him, and to bully him into signing a resignation letter even though Sullivan knew that the Plaintiff had just been released from the hospital after having a massive heart attack.

66.     Sullivan continued to use bully tactics, and attempted to force Plaintiff to sign the resignation letter by placing him under the threat of irreparable harm and damage to his coaching reputation by Sullivan if he did not sign the resignation letter.

67.    Sullivan continued to directly contact Plaintiff, even though he knew full well that he was represented by an attorney and even though he knew he had just been released from the hospital following a heart attack at the close of the March 9, 2020 meeting hosted by Sullivan for the purpose of humiliating, threatening and bullying Plaintiff into signing a forced letter of resignation.

68.    Sullivan continued to call the Plaintiff, even though he knew that he was represented by counsel, and even though he asked for and wrote down Plaintiff's attorney's name and contact information in the March 9' 2020 meeting. Sullivan knew or should have known, that Plaintiff had been hospitalized with a heart attack immediately following the March 9th meeting. Parents, students and other members of the Simsbury community, contacted the hospital to see how the Plaintiff was doing.

69.    In the April 7, 2020 termination letter, Sullivan stated "Regardless of the ultimate DCF findings...we are terminating your contract as the indoor track coach and the out-door track coach... You will be allowed to continue your assignment as a security guard for the Simsbury Public Schools..." The question continues to be asked—if Plaintiff was such a danger to children, why was he allowed to remain in the position as security guard where he comes into contact with these same children?

70.    Plaintiff has great support from parents, assistant coaches, and students at Simsbury High. It is also apparent that no one in the administration viewed him as a danger to children, because if they did, the administration would not have unanimously agreed that he should be allowed to keep his security job. This was specifically referenced in the April 7, 2020 termination letter.

71.     Numerous letters and telephone calls have been received by the Complainant, from parents, students, and other members of the Simsbury community. These letters came from parents, students, and staff of all races, genders and ages. The Complainant is a highly regarded and respected member of the Simsbury Public School community, and there has been great distress among those who have witnessed what happened to Coach Milledge.

72.     From on or about November 2018 to March 2, 2020, Plaintiff would routinely inform Respondent's Athletic Director, Jeff Pinney (Caucasian), of issues that arose with athletes and the coaching programs which he was responsible for.

73. In or about April 2018 to June 2018, Tim Walczak, a Caucasian male, served as Plaintiff's Assistant Coach.

74.     From April 2018 to June 2018, while employed as Plaintiff's Assistant Coach, Tim Walczak was frequently late for practice and late for track meets.

75.     During the spring season of 2018, Walczak also failed to show up for practice and track meets, leaving Plaintiff to handle the entire workload in Walczak's absence.

76.     As Head Coach during Walczak's tenure between April 2018 and June 2018, Plaintiff notified Defendant's Athletic Director Pinney of problems with Walczak's performance.

77.     Walczak was not disciplined while he served as Assistant Coach for the Plaintiff from around April 2018 to June 2018.

78.     Walczak subsequently resigned from the position of Assistant Coach in or around May 2018, citing that he had a newborn baby at home and did not have enough time to perform the job responsibilities.

79.    Plaintiff was terminated by letter dated April 7, 2020, for various pretextual, trumped up reasons.

80.    This termination took place after Plaintiff returned to work following a heart attack.

81.    Plaintiff was replaced with two (2) Caucasian Head Coaches in or around May 2021, for the next season after he was removed from his position as Head Coach of both the Boy's and Girl's Outdoor Track Team.

82.    Sullivan refused to pay the Plaintiff for both of his Head Coaching positions.

83.    Defendant also refused to provide him with the supports that each of the two Caucasian Head Coaches received when they took over Plaintiff's Head Coaching responsibilities.

84.    Sullivan's reason for not paying Plaintiff for both positions that he worked, was because he (Sullivan) was not going to make Plaintiff the highest paid Head Coach at Simsbury High.

85.    This refusal to pay Plaintiff the two stipends which he legitimately earned, took place in or around May 2018, and thereafter.

86.    In or around May 2021, two (2) Caucasian male coaches were hired to replace the Plaintiff for the very next season after he was terminated on April 7, 2020—Tim Walczak and Jeff Osbourne.

87.    One of the Head Coaches hired to replace the Plaintiff, Tim Walczak, was the same former Assistant Coach that worked for Plaintiff, who had been reported on multiple occasions by Plaintiff to Pinney, the Athletic Director, for not doing his job,

including not showing up for practices, not showing up for track meets, and showing up late for events and practices.

88.    Walczak was never disciplined for failure to do his job, even though it left the Plaintiff with responsibility for more than sixty-five (65) students to supervise every day that Walczak was not present to coach, with no additional stipend, and no additional administrative support when Walczak failed to show up for practice, meets, coaching and training responsibilities.

89.    Even against these odds, Plaintiff was one of the highest performing track coaches that Simsbury has ever had.

90.    In or around May 2021, the appointment of Walczak as one of the Head Coaches that was hired to replace Plaintiff, created a hostile work environment for Plaintiff, who had previously been expected to do the job of two Caucasian head coaches, with half of the pay, and little or no administrative or assistant coaching support.

91.    The fact that two Caucasian Head Coaches were hired to replace Plaintiff, and that these Caucasian Head Coaches received assistant coaches and other administrative supports that the Plaintiff did not receive, created a hostile work environment, and a clear inference of disparate treatment in the workplace.

92.    This inequitable treatment also rises to the level of ongoing retaliation or retaliatory treatment of the Plaintiff.

93.    Defendant refused to pay Plaintiff for the two Head Coach jobs that he held from May 2018 to March 25, 2020, and gave him less administrative and less assistant coaching support than the two Caucasian Head Coaches were given.

94.     Defendant allowed full payment of two Caucasian coaches to do the work that the Plaintiff had done alone, without any additional compensation for the first year (2018), and without appropriate or equitable compensation for the second year (2019).

95.     The stated reason given to the Plaintiff by Sullivan in or around April 2018, when the Plaintiff asked Sullivan to be paid two stipends for the work that he was doing, was that Sullivan was not going to make Plaintiff the highest paid coach at Simsbury High.

96.     Plaintiff has exhausted his administrative remedies by filing charges of discrimination with the Commission on Human Rights & Opportunities and the Equal Employment Opportunity Commission. He received a release of jurisdiction on August 20, 2021 and a right to sue letter on October 18, 2021.

97.     On or about November 19, 2021 Plaintiff was  placed administrative leave from his position as school security guard.

98.     In a meeting with his attorney and Susan Homrok-Lemke, Assistant Superintendent of School, Plaintiff was tl that there were new allegations that had been made by students claiming that he had inappropriately touched two female students on their backs.

99.     Homrok-Lemke stated that this had to do with the petition calling for Mr. Milledge's termination from his security guard position and that she wanted to hear his side of the story.

100.    Plaintiff denied that he had been involved in any inappropriate touching of students as had been described by Homrok-Lemke.

101.    Homrok-Lemke contended that she had become aware of the petition on November 17, 2021 and had att

102.    Homrok-Lemke contended that students had informed the district that Plaintiff had discussed his pending federal lawsuit with them.

103.    Plaintiff informed her that he had not voluntarily approached any students abut his lawsuit but because the matter had been publicized in the local newspapers that many people including students had approached him and questioned him about the lawsuit.

104.    Homrok-Lemke stated that Plaintiff had been placed on administrative leave purportedly for his own protection.

105.    Plaintiff also informed the district, through a letter to Homrok-Lemke, that he had not been contacted by the Department of Children & Families regarding any investigation of him as to these "new allegations".

106.    Homrok-Lemke stetted that DCF had declined to investigate these new matters after being informed of them by the district.

107.    The alleged "new allegations" brought up by Homrok-Lemke actually related to a time period prior to Plaintiff being terminated from the head coaching position.

108.    Plaintiff made known to Homrok-Lemke that it was the boyfriend of the same student who was involved in the claims that were brought against him in the spring of 2020 who was now bringing forth these "new allegations".

109.    Upon information and belief, Defendant seized upon these "new allegations" knowing them to be implausible but as a pretext to again attempt to terminate him from his job.

**COUNT ONE:**     **TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED (Race Discrimination)**

1-109. Paragraphs 1-109 are incorporated by reference and made paragraphs 1-109 of this Count One.

110.    The actions of Defendant as described in paragraphs 1-109 were racially discriminatory toward Plaintiff in violation of Title VII of the Civil Rights Act of 1964 as amended.

111.    Plaintiff has been damaged thereby.


**COUNT TWO:**     **TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED (Retaliation)**

1-109. Paragraphs 1-109 are incorporated by reference and made paragraphs 1-109 of this Count Two.

110.    The actions of Defendant as described in paragraphs 1-109 were in retaliation for her having engaged in protected activity and were in violation of Title VII of the Civil Rights Act of 1964 as amended.

111.    Plaintiff has been damaged thereby.


**COUNT THREE:**     **CONNECTICUT GENERAL STATUTES SECTION 46a-60 (Race Discrimination)**

1-109. Paragraphs 109 are incorporated by reference and made paragraphs 1-109 of this Count Three.

110.    The actions of Defendant as described in paragraphs 1-109 were racially discriminatory toward Plaintiff in violation of C.G.S. Section 46a-60.

111.    Plaintiff has been damaged thereby.

**COUNT FOUR:**     **CONNECTICUT GENERAL STATUTES SECTION 46a-60 (a)(4) (Retaliation)**

1-109. Paragraphs 1-109 are incorporated by reference and made paragraphs 1-109 of this Count Four.

110.    The actions of Defendant as described in paragraphs 1-109 were in retaliation for Plaintiff engaging in protected activity, in violation of C.G.S. Section 46a-60.

111.    Plaintiff has been damaged thereby.

**COUNT FIVE:**     **CONNECTICUT GENERAL STATUTES SECTION 31-51Q**

1-109. Paragraphs 1-109 are incorporated by reference and made paragraphs 1-109 of this Count Five.

110.    Plaintiff spoke out on a matter of public concern regarding racial discrimination in the Simsbury Education System.

111.    Plaintiff's speech on matters of public concern did not substantially or materially interfere with his bona fide job performance or the working relationship with the employer.

112.    The discipline and discharge of Plaintiff was on account oof his exercise of rights guaranteed by the First Amendment to the U.S. Constitution or Section 3, 4 or 14 of Article First of the Connecticut Constitution.

113.    Plaintiff has been damaged thereby.

**COUNT SIX:**     **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

1-109. Paragraphs 1-109 are incorporated by reference and made paragraphs 1-109 of this Count Six.

110.   The conduct of Defendant as alleged in paragraphs 1-109 was extreme and outrageous.

111.   The conduct of Defendant was intended to, and did cause, severe emotional distress to the Plaintiff.

112.   The conduct of Defendant was intentional.

113.   Plaintiff has been damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a TRIAL BY JURY and requests the following relief:

(1) a declaratory judgment that Defendant violated Title VII of the CivilRights Act of 1964, as amended 42 U.S.C. § 2000e et seq., C.G.S. §46a-60 and 60 (a)(4), and C.G.S. § 31-51q.

(2) a permanent injunction, prohibiting Defendant from engaging in unlawful employment practices in violation of Title VII and CFEPA;

(3) full back pay from the date of Plaintiff's termination, taking into account all raises to which Plaintiff would have been entitled but for his unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon.

(4) reinstatement to Plaintiffs' former position with Defendant at the pay that he would have received absent the unlawful racial discrimination, or in the alternative, front pay to compensate Plaintiff for lost future wages, benefits, and pension.

(5) compensatory damages in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages.

(6) punitive damages pursuant to C.G.S. §31-51q.

(7) attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and

(8) all other and further relief as this Court deems just and proper.

FOR THE PLAINTIFF
BY _/S/_Cynthia R. Jennings__
Cynthia R. Jennings, Esq. ct21797

Josephine S. Miller, Es. ct27039
Law Office of Cynthia R. Jennings
55 Filley Street
Windsor, CT 06095
Tel: 860.883.6947
Email: attorneyjennings@gmail.com

CERTIFICATION

This is to certify that the foregoing Amended Complaint was served on March 3, 2022. All parties having access to the court CMECF system may access the document through that system.

*/s/ Josephine S. Miller*
Josephine S. Miller